**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

GREAT AMERICAN INSURANCE
COMPANY,

      Plaintiff,

      v.

LEXINGTON INSURANCE COMPANY,

      Defendant.

_____

LEXINGTON INSURANCE COMPANY,

      Counterclaimant,

      v.

GREAT AMERICAN INSURANCE
COMPANY,

      Counterclaim Defendant.

CAUSE NO.: 2:22-CV-345-TLS

**OPINION AND ORDER**

Figg Bridge Builders, LLC (FBB) and Cline Avenue Bridge, LLC (CAB) entered into a Construction Contract for FBB to build the Cline Avenue Bridge in Lake County, Indiana. After CAB terminated FBB from the project before completion, CAB and FBB brought legal proceedings against each other that ultimately led to an arbitration panel awarding FBB a total of $9,671,904.32, consisting of Contract Damages ($4,939,423.98) and Attorneys' Fees ($4,732,480.34), and awarding CAB a total of $5,267,095.00, consisting of Defective Work Damages ($3,706,795.00) and Liquidated Damages ($1,560,300.00). Offsetting FBB's award by CAB's award, the arbitration panel ordered CAB to pay FBB a Net Award of $4,404,809.32.

This is an action between a surety—Plaintiff Great American Insurance Company (GAIC)—and an insurer—Defendant Lexington Insurance Company (Lexington)—to determine the right to $3,911,986.34 of the $4,732,480.34 Attorneys' Fee Award, which is part of the larger, four-part Arbitration Award to FBB—the surety's principal and the insurer's insured—against CAB—the owner on the bonds. GAIC contends its right to the full Net Award derives from a perfected security interest as well as equitable subrogation, whereas Lexington argues its right to the $3,911,986.34 of the Attorneys' Fee Award, which was awarded for the attorneys' fees and costs it paid on behalf of FBB in the arbitration, derives from an express transfer of rights in its insurance contracts with FBB as well as equitable subrogation. This matter is now before the Court on the parties' fully briefed cross motions for summary judgment. ECF Nos. 57, 59. As set forth below, Lexington was the real party in interest to the $3,911,986.34 awarded by the arbitration panel for the attorneys' fees and costs that Lexington paid on behalf of FBB in the arbitration pursuant to the insurance contracts.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing

2

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted).

With cross-motions, a court must construe all facts in a light most favorable to the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## MATERIAL FACTS[1]

**A.     The Bridge Construction Project, the GAIC Performance and Payment Bonds, the Agreement of Indemnity, and the Lexington Insurance Policies**

*1.     The Construction Contract Between FBB and CAB*

On June 8, 2017, Figg Bridge Builders, LLC (FBB) executed an Engineering, Procurement and Construction Agreement (Construction Contract) with Cline Avenue Bridge, LLC (CAB) for the design and construction of the Cline Avenue Bridge located in Lake County, Indiana (the Project). Jt. Ex. 1, ECF No. 55-1.

Under the Construction Contract, FBB was required to obtain and provide performance and payment bonds for the Project to guarantee FBB's contract performance and payment obligations on the Project. *Id.* § 4.19.

---

[1] The parties filed a Joint Statement and Stipulation of Material Facts [ECF No. 54] for purposes of summary judgment and supported by citations to Joint Exhibits. Any fact in this section not supported by a citation is an agreed statement for which no citation was provided. With its motion, GAIC filed a Statement of Material Facts [ECF No. 61] to which Lexington filed a response [ECF No. 66]. In response to Lexington's Motion for Summary Judgment, GAIC filed a Statement of Additional Material Facts [ECF No. 69], to which Lexington filed a response [ECF No. 73].

*2.    The GAIC Performance and Payment Bonds and the Agreement of Indemnity (AOI)*

On June 14, 2017, at the request of FBB, GAIC, as surety, executed Performance Bond

and Payment Bond number 1517337 (the Bonds) for FBB, as principal, and in favor of CAB, as

owner. Jt. Exs. 2, 3, ECF Nos. 55-2, 55-3.[2]

In consideration for its execution of the Bonds, GAIC relied upon an Agreement of

Indemnity (AOI) entered in favor of GAIC in October 2010 by FBB and others (FBB and the

Indemnitors). Jt. Ex. 4, ECF No. 55-4. The AOI contains the following terms:

### PARTIES

FIRST: This Agreement binds the Undersigned [FBB and the Indemnitors] and their heirs, personal representatives, successors and assigns thereof, jointly and severally, to Surety [GAIC] *in connection with all Bond(s)* previously *or in the future executed*, provided or procured by Surety [GAIC]. . . .

### INDEMNITY/EXONERATION

SECOND: The Undersigned [FBB and the Indemnitors], jointly and severally, shall exonerate, indemnify, *hold harmless* and keep the Surety [GAIC] *indemnified from* and against any and all liability for losses, costs, and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs, consultant or expert fees, and counsel fees) and from and against any and all such losses and/or expenses which the Surety [GAIC] may sustain and incur: (1) By reason of being requested to execute or procure, or having executed or procured the execution of Bonds on behalf of any of the Undersigned [FBB and the Indemnitors], (2) By reason of the failure of the Undersigned [FBB and the Indemnitors] to perform or comply with any of the covenants and conditions of this Agreement or (3) in enforcing any of the terms, covenants or conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety [GAIC] by the Undersigned [FBB and the Indemnitors], upon demand by the Surety [GAIC], as soon as liability exists or is asserted against the Surety [GAIC], whether or not the Surety [GAIC] shall have made any payment therefor . . . .

### ASSIGNMENT

THIRD: The Undersigned [FBB and the Indemnitors] hereby consenting, will assign, transfer and set over, and do *hereby assign, transfer, and set over to the Surety [GAIC]*, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Undersigned [FBB and the Indemnitors] to the Surety [GAIC], whether heretofore

---

[2] While the parties' stipulation provides that United Bridge Operating, LLC (UBO) is also an owner on the bonds, neither bond lists UBO as an owner. As it does not appear that reference to UBO is necessary for resolution of these motions, the Court omits the references.

or hereafter incurred, the assignment to become effective retroactive to the date of the first Bond, *but only in the event of* (1) any abandonment, forfeiture or breach or alleged breach of any contracts referred to in the Bonds or of any breach or alleged breach of any Bonds; or (2) any breach or alleged breach of the provisions of any of the paragraphs of this Agreement; or (3) a default or alleged default in discharging such other indebtedness or liabilities when due; . . . :

> (a) *All the rights* of the Undersigned [FBB and the Indemnitors] in, and growing in any manner out of the Bonds or *any contracts* referred to in the Bonds;
> . . .
> (d) *All actions*, causes of actions, *claims and/or the proceeds* therefrom and any demands whatsoever which the Undersigned [FBB and the Indemnitors] may have or acquire against any party, including but not limited to owners, obligees, [or] subcontractors, . . . ;
> (e) Any and all *percentages retained* and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds . . . ;

**TRUST FUNDS**

FOURTH: Undersigned [FBB and the Indemnitors] covenant and agree that *all funds* received by them, or *due or to become due* under any contract covered by any Bond *are trust funds* whether in the possession of the Undersigned [FBB and the Indemnitors] or another, for the benefit of all parties to whom the Undersigned [FBB and the Indemnitors] incur[] obligations in the performance of the contract covered by the Bond(s) and/or *for the benefit of, payment to or reimbursement of the Surety [GAIC]* for any liability, loss or expense the Surety [GAIC] may incur under the Bond(s) or in enforcing this Agreement. If the Surety [GAIC] discharges any such obligation, the Surety [GAIC] shall be entitled to assert the claims of any such party to the trust funds . . . .

**ADVANCES**

NINTH: The *Surety [GAIC]*, in its sole discretion, is *authorized* and empowered, but not obligated, . . . *to advance or lend* to the Undersigned [FBB and the Indemnitors] any money, as the Surety [GAIC] may see fit, *for the purpose of any contracts* referred to in, or guaranteed by the Bonds, and all [such] money . . . shall be presumed to be a loss by the Surety [GAIC] for which the Undersigned [FBB and the Indemnitors] shall be responsible . . . .

*Id.* (emphasis added by the parties).

On December 18, 2019, following a request by FBB that GAIC advance funds to FBB for use on the Project, GAIC entered into a Financing and Collateral Agreement (Financing Agreement) with FBB and the Indemnitors, within which FBB and the Indemnitors acknowledged and reaffirmed their obligations and liabilities to GAIC under the AOI and

5

granted GAIC a "continuing lien and security interest in all of the tangible and intangible personal property" described in an attachment to the Financing Agreement. Jt. Ex. 5, ¶ I.4, ECF No. 55-5. FBB affirmed that the Construction Contract was not complete and that "but for the willingness of the Surety [GAIC] to enter into this Agreement, the Principal [FBB] is unable to complete the performance of the [Construction Contract] and pay its subcontractor and suppliers of labor and/or materials with respect to the [Construction Contract] and [Project]." *Id*., p. 1.

Between January and April 2020, pursuant to the December 2019 Financing Agreement and the October 2010 AOI, at the request of FBB, and with the knowledge and consent of CAB, GAIC advanced funds to FBB in the amount of $14,775,000.00 to support FBB's performance of the Construction Contract. Jt. Ex. 6, p. 3, ECF No. 55-6. FBB authorized GAIC to file a Form UCC-1 (UCC Financing Statement), providing GAIC a security interest in, among other things:

> All of the Debtors[sic] [FBB and the Indemnitors'] rights, title, and interest in: (a) all rights of Debtors [FBB and the Indemnitors] in, and growing in any manner out of the Bonds or any contracts referred to in the Bonds; (b) all machinery, equipment, vehicles, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere . . . ; (d) all actions, causes of action, claims and/or the proceeds therefrom and any demands whatsoever which the Debtors [FBB and the Indemnitors] may have or acquire against any party, including but not limited to owners [and] obligees . . . ; (e) any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Debtors [FBB and Indemnitors] have an interest; [and] (f) all accounts receivable . . . .

Jt. Ex. 7, p. 3, ECF No. 55-7. On August 31, 2020, GAIC filed the UCC Financing Statement with a retroactive effective date of the first Bond executed by GAIC. *Id.*, p. 1; Jt. Ex. 4, p. 2.

*3.*       *The Lexington Professional Liability and General Liability Policies*

Lexington issued two liability insurance policies to FBB with respect to the Project—a

Professional Liability Policy and a General Liability Policy, both of which were issued in

Florida. Jt. Ex. 8, pp. 1, 43, ECF No. 55-8; Jt. Ex. 9, p. 7, ECF No. 55-9.[3]

a)       Professional Liability Policy

The Professional Liability Policy contains the following transfer of rights clause:

**C.  Transfer of Rights of Recovery**

If there is a payment made by the Company [Lexington], the Company
[Lexington] shall be subrogated to all the Insured's [FBB's] rights of recovery
against any person or organization. The Insured [FBB] shall cooperate with the
Company [Lexington] and do whatever is necessary to secure these rights. The
Insured [FBB] shall do nothing after a Claim or after learning of an incident,
circumstances or event reasonably likely to give rise to a Claim to waive or
prejudice such rights.

Jt. Ex. 9, p. 15.

b)       General Liability Policy

The General Liability Policy contains the following transfer of rights clause:

**8.  Transfer of Rights of Recovery Against Others to Us**

If the insured [FBB] has rights to recover all or part of any payment we
[Lexington] have made under this policy, those rights are transferred to us
[Lexington]. The insured [FBB] must do nothing after loss to impair them. At
our [Lexington's] request, the insured [FBB] will bring "suit" to transfer those
rights to us [Lexington] and help us [Lexington] enforce them.

Jt. Ex. 8, p. 23.

The General Liability Policy contains an endorsement with the following language:

**Waiver of Subrogation**
**(Blanket)**

It is agreed that we, in the event of a payment under this policy, waive our right of
subrogation against  any  person  or  organization  *where  the  insured  has  waived*

---

[3] Lexington also issued an excess policy that the parties represent is not relevant to this case.

*liability of such person or organization as part of a written contractual agreement* between the insured and such person or organization entered into prior to the "occurrence" or offense."

All other terms and conditions remain unchanged.

*Id.*, p. 36 (emphasis added).

     c)     The Construction Contract—Waiver of Subrogation Provision

The Construction Contract contains the following language on insurance and waivers:

### III.    General Conditions

All insurance required by this Agreement shall be purchased and maintained with a company or companies lawfully authorized to do business in the State of Indiana. Such insurance shall be for limits of liability as specified for the Project or legally required, whichever is greater. All required insurance policies shall be endorsed or provided thirty (30) Days prior written notice by certified mail, of any material change, cancellation, or non-renewal to EPC Contractor [FBB] and Owner [CAB]. Owner [CAB] and EPC Contractor [FBB] and where applicable, Major Subcontractors or Subcontractors, shall each be named as additional party insured on the policies required to be obtained hereunder. Proof of the required insurance and endorsements shall be made by submission of certificates of insurance to Owner [CAB] and EPC Contractor [FBB] prior to commencement of a Project. *All insurance policies shall contain a waiver of subrogation provision* pursuant to which *the insurer is prohibited from obtaining subrogation or transfer rights in respect of any claim under such policies against EPC Contractor [FBB], Owner [CAB]* or where applicable, Major Subcontractors or Subcontractors and their employees, directors or officers.

Jt. Ex. 1, Sched. II-6, ECF No. 55-1, p. 126 (emphasis added).[4]

### B.    CAB's Termination of FBB from the Project and Subsequent Events

*1.    CAB's Termination of FBB from the Project, CAB's Initiation of the Arbitration Against FBB, and FBB's Request for a Defense from Lexington*

By letter dated April 7, 2020, CAB terminated FBB from the Project, before the Project's

completion. Jt. Ex. 10, ECF No. 55-10. Pivot Engineers (Pivot) authored a memorandum on

---

[4] It its reply brief, GAIC selectively quotes this provision to give it a meaning not intended by the provision's plain language: "[T]he Construction Contract provides that 'the insurer is prohibited from obtaining subrogation or transfer rights in respect of any claim under such policies against [FBB], [CAB], or where applicable Major Subcontractors . . . .'" GAIC Reply 14, ECF No. 71.

behalf of CAB dated June 11, 2020, and an amended memorandum June 25, 2020, identifying

FBB's alleged construction defects.

On July 27, 2020, CAB filed a demand for arbitration against FBB with the American

Arbitration Association (the "Arbitration"), contending that it was entitled to damages from FBB

for defective work and for delays on the Project. Jt. Ex. 12, pp. 4, 5, 23, 47–48, ECF No. 55-12.

FBB tendered a request to Lexington for a defense in the arbitration.

*2.      GAIC's Payment of Claims Following CAB's Termination of FBB and GAIC's Lawsuit
         Against FBB*

Following CAB's termination of FBB, GAIC received Payment Bond claims from

subcontractors and suppliers to FBB, paying out $4,346,604.44 on the claims; GAIC also

advanced an additional $4,860,504.66 to FBB. Jt. Ex. 6, pp. 2–3. CAB made claims against

GAIC for performance and payment under the Performance Bond; GAIC disputed the necessity

of terminating FBB from the Project and, thus, disputed any obligation to CAB resulting from

the termination. Jt. Ex. 11, ECF No. 55-11. GAIC has incurred and paid costs and expenses,

including attorneys' fees, as of September 25, 2024, totaling $2,645,242.49 related to payment

bond claims and CAB's performance bond claim. Jt. Ex. 6, pp. 7–12.

GAIC's losses and expenses to date total $26,627,351.59 for which GAIC has a pending

lawsuit against FBB alleging a right to recovery under the AOI. GAIC has recovered

$2,460,256.47, not including the Arbitration Award referenced below. *Id.*, p. 5.

**C.      The Underlying Arbitration and the Lake County Action**

*1.      The Arbitration*

As noted above, on July 27, 2020, CAB filed its demand for arbitration against FBB,

suing for breach of contract, fraud, constructive fraud, negligence/gross negligence, and

indemnity and seeking over $92 million in damages against FBB. Jt. Ex. 12, pp. 1–3.

FBB counterclaimed against CAB for breach of contract, unjust enrichment, quantum meruit, and conversion arising out of the alleged wrongful termination of the Construction Contract (FBB's Affirmative Claims). *Id.*, p. 3.

GAIC's request to join the Arbitration, to which CAB objected, was denied.

### 2.    *Lake County, Indiana, Superior Court*

Meanwhile, on August 12, 2020, CAB sued GAIC in Lake County, Indiana, Superior Court, Cause No. 45D01-2008-PL-000517 (Lake County Action), and GAIC brought a Third-Party Complaint against FBB (and the other Indemnitors to the AOI).[5]

### 3.    *Counsel for FBB and Lexington's Defense Coverage*

FBB provided GAIC's Third-Party Complaint in the Lake County Action to Lexington and requested that Lexington provide a defense in the state court action.

After FBB's request for a defense in the Arbitration, Lexington issued coverage letters related to the Arbitration. Jt. Exs. 13, 14, ECF Nos. 55-13, 55-14. Lexington initially retained the Norris Choplin law firm to defend FBB in the Arbitration and subsequently retained the Foran Glennon law firm. Jt. Ex. 13, p. 2; GAIC Ex. 3, ¶ 20, ECF No. 62-3. Lexington defended FBB in the Arbitration under a reservation of rights under both the General Liability and the Professional Liability Policies, spending over $4 million dollars on FBB's defense.

FBB requested that Lexington also fund the cost of prosecuting its Affirmative Claims against CAB in the Arbitration, which Lexington denied. GAIC Ex. 3, ¶¶ 21, 22. Lexington's coverage position was that the policies only covered costs to defend FBB. Jt. Ex. 13, at p. 2; Jt. Ex. 14, at p. 2. Thus, FBB paid its own attorneys' fees and costs for its Affirmative Claims against CAB, hiring the Kreig DeVault and Butler Snow law firms. GAIC Ex. 3, ¶¶ 15, 23.

---

[5] The state court docket is available at https://public.courts.in.gov/mycase/#/vw/Search.

10

**D.      The Arbitration Award**

Evidentiary hearings in the Arbitration were held in March 2022. Jt. Ex. 12, p. 3. The arbitration panel issued its Arbitration Award on July 15, 2022. *Id.*, p. 77.

In the Arbitration, CAB sought "net damages in the total amount of $92,587,921." *Id.*, p. 2. CAB alleged that one justification for its termination of FBB was that FBB was insolvent. *Id.*, p. 20. The arbitration panel found that FBB was not insolvent at the time of termination. *Id.*, pp. 22–23. The arbitration panel reasoned that "GAIC's decision to provide financial assistance to FBB was significant" as "GAIC was committed to completion of the Project" and "intended to see the Project through to completion." *Id.*, pp. 21–22.

The arbitration panel found that

(a)      FBB defaulted under the contract with CAB (but the default was *not* a material breach of the contract) and awarded CAB $3,706,795.00 in damages for corrective work (Defective Work Damages) and $1,560,300.00 in liquidated damages due to delay in completion (Liquidated Damages),[6] *id.*, pp. 72–74;

(b)      CAB wrongfully terminated FBB and awarded FBB damages for wrongful termination in the amount of $4,939,423.98 (Contract Damages) for unpaid work through March 2020, unpaid retainage, unpaid work for the first week of April 2020, crane mats credit, falsework credit, and post-termination expenses, *id.*, pp. 46–47, 77; and

(c)      CAB's wrongful termination of FBB was a material breach of the covenant of good faith and fair dealing set forth in Article 17.5 of the Construction Contract and, as a result,

---

[6] In its briefs, GAIC refers to the Liquidated Damages as "Delay Damages." As the Construction Contract and Arbitration Award refer to this award as "Liquidated Damages," so does this Court. *See* Jt. Ex. 12, p. 76; Jt. Ex. 1, p. 37. Lexington notes that its policies do not cover liquidated damages. *See* Jt. Ex. 8, p. 2; Jt. Ex. 9, p. 13. FBB has sued Lexington over the Liquidated Damages, among other things, in federal court in Florida. *See Figg Bridge Builders, LLC v. Lexington Ins.* 4:21-CV-378 (M.D. Fla.).

as requested by FBB under Sections 14.3.4 and 14.4.2 of the Construction Contract, "FBB is entitled to an award of reasonable attorneys' fees and costs directly arising out of CAB's wrongful termination of FBB" in the amount of $4,732,480.34 (Attorneys' Fee Award).[7] *Id.*, pp. 75–76. The Attorneys' Fee Award was expressly based on FBB's submission of affidavits documenting its attorneys' fees and costs incurred in connection with the Arbitration. *Id.*, p. 76; Jt. Exs. 21–25, ECF Nos. 55-21 through 55-25. Specifically, the panel found the following sums to be reasonable and awarded them to FBB:

| | |
|---|---|
| Butler Snow LLP | $219,625.00 |
| *Norris Choplin Schroeder LLP* | *$628,362.95* |
| Krieg DeVault LLP | $177,616.00 |
| *Foran, Glennon, Palandech, Ponzi & Rudloff PC* | |
| *Legal Fees* | *$1,448,628.80* |
| *Expenses* | *$1,834,994.59*[8] |
| Fees and Expenses Paid Directly by FBB | $423,253.00 |
| TOTAL: | $4,732,480.34 |

Jt. Ex. 12, p. 76. Of the $4,732,480.34 Attorneys' Fee Award, Lexington is seeking only the fees and expenses it paid the Norris Choplin Schroeder LLP and Foran, Glennon, Palandech, Ponzi & Rudloff PC law firms to defend FBB in the Arbitration, which total $3,911,986.34.

Based on the total awards of $9,671,904.32 to FBB ($4,939,423.98 Contract Damages + $4,732,480.34 Attorneys' Fee Award) and $5,267,095.00 to CAB ($3,706,795 Defective Work Damages + $1,560,300 Liquidated Damages), the arbitration panel awarded FBB the net amount of $4,404,809.32 (Net Award) to "be paid by CAB to FBB within thirty days of the date of [the]

---

[7] In its briefs, GAIC refers to the Attorneys' Fee Award as "Bad Faith Damages" and characterizes them as a "sanction." As neither term is found in the Arbitration Award or the Construction Contract; the title of the relevant section in the Arbitration Award is "Attorneys' Fees and Costs," Jt. Ex. 12, pp. 75–76; and the arbitration panel described the award as "an award of reasonable attorneys' fees and costs," this Court uses the term "Attorneys' Fee Award."

[8] For completeness, an additional $281,625.00 in arbitration fees was paid by the Foran Glennon law firm that was not awarded by the arbitration panel such that Lexington is not seeking the amount here, even though Lexington paid FBB's portion of the arbitration fees. *See* Ex. 24, ¶ 8, ECF No. 55-24.

Award" (by August 14, 2022), with interest commencing thereafter at the rate established by

Indiana law. *Id.*, p. 77.

**D.      The Instant Litigation: GAIC and Lexington's Competing Claims to $3,911,986.34 of the Attorneys' Fee Award**

On August 1, 2022, GAIC wrote to CAB, demanding that CAB issue a check payable to

GAIC for $4,404,809.32—the total Net Award. *See* Jt. Ex. 15, ECF No. 55-15.

During the first week of August 2022, FBB provided Lexington with a copy of GAIC's

letter to CAB, the Bonds, the AOI, and the UCC filing. On August 8, 2022, Lexington wrote to

CAB about GAIC's letter and contended that Lexington had "advanced" $2,179,468.83 to FBB

for the payment of attorneys' fees and expenses under the Professional Liability Policy. *Id.*

Lexington instructed CAB to redirect that sum from the Net Award to Lexington. *Id.* On August

11, 2022, Lexington revised the demand to $2,064,634.54 and referred to Lexington's rights to

the payment as arising from the subrogation provision of the Professional Liability Policy. Jt. Ex.

16, ECF No. 55-16. Lexington also noted that the amount did not include the attorneys' fees

Lexington advanced for FBB's defense under the General Liability Policy. *Id.*

On August 12, 2022, GAIC wrote to Lexington, provided the UCC Financing Statement

previously filed, communicated GAIC's interest in the Net Award, and warned that Lexington's

demand for payment of any portion of the Net Award constituted interference with GAIC's

rights. Jt. Ex. 17, ECF No. 55-17. GAIC demanded that Lexington withdraw its demand. *Id.*

The same day, Lexington wrote to GAIC and claimed that Lexington had the right of

subrogation under the Professional Liability Policy to all FBB's claims and rights to recover

from CAB the monies Lexington paid for FBB's defense. Jt. Ex. 18, ECF No. 55-18. Lexington

declined to withdraw its demand for payment. *Id.*

**E.**      **Interpleader and Ultimate Confirmation of the Award**

On August 12, 2022, CAB moved to interplead the $4,404,809.32 Net Award and deposit it in the Lake County Action, alleging that multiple parties claimed a right to the funds, which included GAIC, Lexington, and potentially CAB itself if the Net Award were to be vacated. Jt. Ex. 19, ECF No. 55-19. The court granted the motion.

On August 23, 2022, FBB filed a Petition to Confirm Arbitration Award in the Lake County Action, and on October 12, 2022, CAB moved to vacate the Net Award. On November 8, 2022, Lexington moved to intervene. Jt. Ex. 20, ECF No. 55-20. On February 17, 2023, the court in the Lake County Action issued an order confirming the Net Award. The court also granted Lexington's Motion to Intervene solely to protect Lexington's interest in the Net Award.

On February 28, 2023, GAIC and FBB jointly moved for distribution of the interpleaded funds. On March 1, 2023, Lexington objected, and on April 17, 2023, CAB filed a notice of no objection. On June 20, 2023, GAIC filed a supplement, explaining that Lexington answered GAIC's complaint in this federal action and brought counterclaims. On June 26, 2023, Lexington withdrew its objection in favor of resolving its claim to a portion of the Attorneys' Fee Award in this federal forum. On June 27, 2023, the state court ordered distribution of the interpleaded funds to GAIC, and GAIC received a check on July 6, 2023, for $4,404,809.32.

**F.**      **Lexington's Insurance Payment to FBB of the $3,706,795.00 Defective Work Damages Award to CAB and FBB's Claims Against Lexington for Additional Payments, Including the $1,560,300.00 Liquidated Damages Award**

On the day the Arbitration Award became final, Lexington notified FBB that it was ready to indemnify FBB under the insurance policies for the $3,706,795.00 of Defective Work Damages awarded to CAB by the arbitration panel, which had offset FBB's total award. GAIC

14

Ex. 12, ECF No. 62-12. Lexington made the payment jointly to FBB and GAIC in two payments on April 3, 2023, and April 19, 2023. Jt. Exs. 26, 27, ECF Nos. 55-26, 55-27.

Lexington did not pay FBB the remaining $1,560,300.00 in Liquidated Damages awarded to CAB on the basis that liquidated damages are not covered by the insurance policies. Coverage of the Liquidated Damages, as well as FBB's demand for indemnification of lost opportunity cost relating to the Arbitration Award and reimbursement of the fees incurred by FBB in the Arbitration and related state court actions, are the subject of federal litigation in Florida between FBB and Lexington that is currently stayed for arbitration. *See Figg Bridge Builders, LLC v. Lexington Ins.* 4:21-CV-378 (M.D. Fla.); GAIC Ex. 3, ¶ 40.

## PROCEDURAL BACKGROUND

**A.     GAIC's Claims**

GAIC's Amended Complaint [ECF No. 32] alleges that it is entitled to the full Net Award because it is entitled to recover all its losses and expenses from FBB and others, pursuant to the AOI and the filed UCC Financing Statement. Am. Compl. ¶ 26, ECF No. 32.

*1.     Count I: Tortious Interference with a Contractual Relationship*

GAIC alleges that the AOI and UCC Financing Statement provide it with the legal, contractual, perfected, first, best, and superior right to recover the Net Award; that Lexington knew of the AOI yet intentionally and wrongfully alleged a competing interest in the Net Award; Lexington's actions interfered with GAIC's right to payment of the Net Award; and Lexington's conduct was unjustified. GAIC seeks judgment in its favor in the amount of $4,404,809.32, pre- and post-judgment interest, costs, and attorneys' fees.

*2.     Count 2: Declaratory Judgment*

Pursuant to 28 U.S.C. § 2201, GAIC requests a declaratory judgment that Lexington has no legal interest in the Net Award; that even if Lexington has a legal interest in the Net Award, GAIC has a priority interest in the Net Award; and that GAIC be awarded its costs and expenses incurred in prosecution of its declaratory judgment action.

*3.     Count 3: Trespass to Chattels and Count 4: Attorneys' Fees*

The Court previously dismissed GAIC's trespass to chattels claim in Count 3. *See* Apr. 27, 2023 Op. & Ord., ECF No. 23. And GAIC's demand for an award of attorneys' fees in Count 4 is being dismissed in this Opinion by stipulation of the parties. *See* ECF No. 56.

**B.     Lexington's Counterclaims**

Lexington filed a Counterclaim [ECF No. 28], alleging that it has the sole right to recover the full extent of the fees and costs that it paid for FBB's defense in the Arbitration that were included in the Arbitration Award. Countercl. ¶ 12, ECF No. 28.

*1.     Count I: Tortious Interference with Contract*

Lexington alleges that the insurance policies issued to FBB provide Lexington with a subrogation right to recover payments it made on FBB's behalf; GAIC was aware of the insurance contracts between Lexington and FBB; and without justification, GAIC interfered with the contractual relationship between FBB and Lexington by inducing FBB to not fulfill its obligations under the policies regarding Lexington's rights to recover the payments that it made. Lexington seeks an award of damages in that portion of the Net Award that represents defense fees and costs awarded in favor of FBB that were actually paid by Lexington and an award of Lexington's fees and costs incurred in this litigation.

16

2.    *Count II: Imposition of Equitable Lien/Constructive Trust*

Lexington alleges that it has the sole entitlement (or, at a minimum, superior entitlement) to that portion of the Net Award that represents the defense fees and costs that were paid by Lexington; Lexington has been prevented from exercising its right to recover those funds because of GAIC's actions; given Lexington's superior right to the funds, any constructive or actual possession of the funds by GAIC represents an unjust enrichment to GAIC; and the imposition of an equitable lien and/or constructive trust over the funds in favor of Lexington is appropriate to ensure Lexington may recover those funds.

## ANALYSIS

The question before the Court is whether GAIC as the surety or Lexington as the insurer is entitled to the $3,911,986.34 the arbitration panel awarded to FBB as attorneys' fees that were originally paid by Lexington. Neither party has identified any case with the same or analogous factual situation, and the Court has not found any. Having considered the law and arguments offered by the parties, the Court finds that Lexington has the right to the disputed $3,911,986.34 of the Attorneys' Fee Award representing its payment of fees and costs on behalf of FBB in the Arbitration.

**A.    Nature of the Arbitration Award**

The parties agree that the first step is to address the nature of the Arbitration Award in which the arbitration panel awarded FBB the $3,911,986.34 in attorneys' fees and costs at issue. In its decision, the arbitration panel separately explained the basis for and specifically identified the amount of each of the four awards that it made: (1) $4,939,423.98 in Contract Damages for FBB and against CAB; (2) $4,732,480.34 in Attorneys' Fees for FBB and against CAB; (3) $3,706,795.00 in Defective Work Damages for CAB and against FBB; and (4) $1,560,300.00

17

in Liquidated Damages for CAB and against FBB. Because the two awards to FBB totaling $9,671,904.32 were greater than the two awards to CAB totaling $5,267,095.00, the arbitration panel offset FBB's total by CAB's total and awarded FBB a Net Award of $4,404,809.32, which is currently held by GAIC.

As detailed in the Material Facts above, the arbitration panel expressly based the $4,732,480.34 Attorneys' Fee Award to FBB on affidavits submitted by FBB's various arbitration counsel. It is undisputed that the $3,911,986.34 at issue reflects sums Lexington spent on the defense of FBB in the Arbitration. It is also undisputed that Lexington is only seeking recovery of that $3,911,986.34 and is not seeking either the remaining $820,494.00 of the Attorneys' Fee Award for fees that were paid by FBB or the $4,939,423.98 in Contract Damages awarded to FBB (a total of $5,759,917.98). As soon as the Arbitration Award was confirmed and the time to appeal had expired, on March 20, 2023, Lexington tendered to FBB and GAIC jointly under the insurance policies the $3,706,795.00 in Defective Work Damages awarded to CAB and against FBB, which had originally reduced FBB's recovery in the Net Award because the Defective Work Damages award to CAB offset the total award to FBB.

Thus, the payments received by FBB from the Arbitration Award now total $8,111,604.32 ($4,404,809.32 Net Award + $3,706,795.00 indemnification by Lexington for Defective Work Damages awarded to CAB). The difference between the original total award to FBB of $9,671,904.32 and the $8,111,604.32 FBB has received to date is the remaining offset of $1,560,300.00 in Liquidated Damages awarded in favor of CAB and against FBB.

As the Court finds that Lexington has the right to the $3,911,986.34 in attorneys' fees, FBB's total award will be reduced from $9,671,904.32 to $5,759,917.98 and the $8,111,604.32 received by FBB will be reduced to $4,199,617.98. The difference between the reduced total

18

award to FBB and the reduced amount received by FBB is again the remaining offset of $1,560,300.00 in Liquidated Damages.

FBB and Lexington's dispute over whether the $1,560,300.00 in Liquidated Damages is covered by the insurances policies is the subject of the pending Florida arbitration. If it is determined that Lexington does not have to indemnify FBB for the Liquidated Damages, then the Liquidated Damages are FBB's responsibility, and FBB will have been made whole in the Arbitration notwithstanding the offset for the Liquidated Damages. If it is found that Lexington must indemnify FBB for the Liquidated Damages, then Lexington will indemnify FBB for the Liquidated Damages and FBB will have received the full Contract Damages and the remaining Attorneys' Fee Award no longer subject to any offset. Therefore, it is unnecessary in this ruling to offset Lexington's recovery by the Liquidated Damages.

Focusing on the original $4,404,809.32 Net Award, GAIC argues that it is improper for Lexington to treat the $3,911,986.34 in attorneys' fees it seeks as a unique, separate amount to be set aside for Lexington's recovery because the four-part Arbitration Award is mixed within the Net Award. GAIC ignores that Lexington has since indemnified FBB for the $3,706,795.00 in Defective Work Damages awarded to CAB that offset FBB's recovery and resulted in the Net Award. Therefore, the Court considers GAIC's reasoning as to the updated payment to FBB of $8,111,604.32, which, as stated above, is the equivalent of the total award to FBB of $9,671,904.32 ($4,939,423.98 Contract Damages and $4,732,480.34 Attorneys' Fee Award) now offset only by the $1,560,300.00 Liquidated Damages awarded to CAB and against FBB.

GAIC argues that it is improper for Lexington to assume that the $1,560,300.00 in Liquidated Damages solely reduces the $4,939,423.98 of Contract Damages, leaving the entire Attorneys' Fee Award to be distributed, including the full $3,911,986.34 in attorneys' fees

sought by Lexington. GAIC reasons that an allocation could just as easily be made to reduce the Attorneys' Fee Award, starting with the fees sought by Lexington, and leaving the Contract Damages fully intact for GAIC. However, as set forth below, Lexington was the real party in interest to the $3,911,986.34 in attorneys' fees such that the $3,911,986.34 never passed to FBB. And again, the arbitration panel based the award on four separate awards, two to FBB and two to CAB. The Net Award is the result of the offset.

Finally, both parties characterize the importance of their respective roles in the arbitration panel's finding that CAB was in default under the Construction Contract based on CAB's wrongful termination of FBB, which led to the Attorneys' Fee Award under Section 14.4.2. For example, Lexington reasons that, to conclude that CAB wrongfully terminated FBB, the arbitration panel had to determine that FBB was not in material breach of the contract, which would have warranted the termination. Said differently, if Lexington's defense had failed, the arbitration panel would have found FBB in breach of contract; FBB's termination from the Project by CAB would have been justified, rather than wrongful; and FBB would not have recovered on its Affirmative Claims. In contrast, GAIC argues the arbitration panel's finding that FBB was not insolvent at the time of the termination was based on GAIC advancing over $14 million to prevent FBB's default. In other words, without GAIC's funding advances and FBB's funding of its own Affirmative Claims, there would be no finding of CAB's default and no Attorneys' Fee Award. However, the arbitration panel made no such finding as to either party's contribution to the granting of the Attorneys' Fee Award in terms of FBB's defense versus FBB's Affirmative Claims. Rather, the arbitration panel expressly based the Attorneys' Fee Award on the affidavits of FBB's counsel, which specifically included the $3,911,986.34 in attorneys' fees and costs paid by Lexington.

**B.       Lexington's Contractual Interest in the $3,911,986.34 of the Attorneys' Fee Award**

Lexington's primary argument, both seeking and defending summary judgment, is that, under the transfer of rights provisions of the insurance contracts, Lexington is the real party in interest to the $3,911,986.34 of the Attorneys' Fee Award for the sums that it actually paid the two law firms for FBB's defense in the Arbitration. Lexington argues that FBB never had a right to that $3,911,986.34 of the Arbitration Award and, as a result, any security interest of GAIC's never attached and any equitable right of subrogation of GAIC did not reach the $3,911,986.34 of the Attorneys' Fee Award. The Court agrees.

As an initial matter, applying Indiana Choice of Law Principles, the Court finds that Indiana law applies to this claim because there is no conflict. Sitting in diversity, the Court applies Indiana choice of law rules to determine which substantive law will govern this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). However, a court does not reach the question of which state's substantive law applies to a claim unless "the differences between the laws of the states are 'important enough to affect the outcome of the litigation.'" *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004) (quoting *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)); *see Mathis v. Metro. Life Ins.*, 12 F. 4th 658, 662 (7th Cir. 2021) (citing *Simon*, 805 N.E.2d at 805). "'If the purposes and policies of two potential rules are the same, the forum should apply the forum law." *Ky. Nat'l Ins. v. Empire Fire & Marine Ins.*, 919 N.E.2d 565, 575 (Ind. Ct. App. 2010) (citation omitted).

Both parties assert there is no conflict. However, Lexington contends that "Florida law informs the resolution of the claim to the attorneys' fee award as between Lexington and FBB under the policies" because "FBB is based in Florida and Lexington's policy was issued to FBB

21

in Florida." Lexington Summ. J. Br., ECF No. 58, p. 7, n.15. Because the resolution of the

Attorneys' Fee Award as between FBB and Lexington is material to the resolution of this claim,

the Court considers whether there is a conflict between the laws of Florida and Indiana important

enough to affect the outcome of the litigation and finds there is not.

The general principles of subrogation are the same under Indiana and Florida law. Both

Indiana and Florida recognize that "subrogation can arise both by contract and in equity." *Puente*

*v. Beneficial Mortg. Co. of Ind.*, 9 N.E.3d 208, 215 (Ind. Ct. App. 2014) (identifying the two

categories as "conventional," which arises under a contract, and "legal," which arises under the

common law or in equity); *see Columbia Cas. Co. v. Ker, Inc.*, No. 6:07-CV-65, 2008 WL

11338289, at *4 (M.D. Fla. Oct. 29, 2008), *order clarified on recon.*, No. 6:07-CV-65, 2009 WL

10672923 (M.D. Fla. Mar. 31, 2009) (citing *Cont'l Cas. Co. v. Ryan Inc. E.*, 974 So. 2d 368, 376

(Fla. 2008); *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 646 (Fla. 1999)).

Both states recognizes that equitable "subrogation is a doctrine of equity . . . [that] applies

whenever a party, not acting as a volunteer, pays the debt of another that, in good conscience,

should have been paid by the one primarily liable." *LBM Realty, LLC v. Mannia*, 19 N.E.3d 379,

386 (Ind. Ct. App. 2014) (citing *Erie Ins. v. George*, 681 N.E.2d 183, 186 (Ind. 1997)); *see Dade*

*Cnty. Sch. Bd.*, 731 So. 2d at 646 (listing five elements of equitable subrogation as "(1) the

subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a

volunteer, (3) the subrogee was not primarily liable for the debt, (4) the subrogee paid off the

entire debt, and (5) subrogation would not work any injustice to the rights of a third party").

"When the insurer claims a right through [equitable] subrogation, it stands in the shoes of

the insured and takes no rights other than those which the insured had." *LBM Realty, LLC*, 19

N.E.3d at 386 (citing *United Farm Bureau Mut. Ins. v. Owen*, 660 N.E.2d 616, 619 (Ind. Ct.

App. 1996)); *see Allstate Ins. v. Metro. Dade County*, 436 So. 2d 976, 978 (Fla. Dist. Ct. App. 1983) ("Thus, the subrogee 'stands in the shoes' of the subrogor and is entitled to all of the rights of its subrogor . . . ." (citation omitted)). And both states recognize that "[t]he ultimate purpose of the doctrine, as with other equitable principles, is to prevent unjust enrichment." *LBM Realty, LLC*, 19 N.E.3d at 386 (citing *Erie Ins.*, 681 N.E.2d at 186); *see W. Am. Ins. Co. v. Yellow Cab Co. of Orlando*, 495 So. 2d 204, 207 (Fla. Dist. Ct. App. 1986) ("The doctrine is based on the policy that no person should be unjustly enriched by another's loss . . . ." (citation omitted)).

Here, Lexington asserts conventional subrogation based on the plain terms of its insurance contracts with FBB. Florida law recognizes the right, under both conventional and equitable subrogation, of a liability insurer to recover fees defending its insured:

> After an insurance company has paid a loss on behalf of its insured, it is entitled to subrogation either by express contract rights, or by equitable subrogation by operation of law. *This right of subrogation would include rights against its own insured, if the insured were to recover and attempt to keep costs and expenses awarded in this case.*

*Aspen v. Bayless*, 564 So. 2d 1081, 1082–83 (Fla. 1990) (emphasis added) (quoting and agreeing with *Hough v. Huffman*, 555 So. 2d 942, 944–45 (Fla. Dist. Ct. App. 1990)); *see Columbia Cas. Co.*, 2008 WL 11338289, at *9 (allowing insurer that paid defense costs to subrogate against the fee award that the insured obtained in the underlying litigation for fees the insurer paid where the insured was made whole by a jury's award of damages, the insurance contract had a provision subrogating the insurer to the insured's rights and remedies, and principles of equitable subrogation so dictated). In *Miles v. Jones*, the court recognized that a "court may award fees and costs even to defendants who are nominal parties in interest because it is understood that they will reimburse their insurance carriers." No. 08-20612-CIV, 2011 WL 10565588, at *4 (S.D. Fla. Feb. 4, 2011) (citing *Schafler v. Fairway Park Condo. Ass'n*, 324 F. Supp. 2d 1302, 1305 (S.D.

Fla. 2004); *Maseda v. Honda Motor Co.*, 128 F.R.D. 124, 125–126 (S.D. Fla. 1989); *Ross v. Fay's Drug Co. of Cohoes, Inc.*, 502 N.Y.S.2d 945, 946 (N.Y. Sup. Ct. 1986)). The court acknowledged that "the entry of judgment in favor of the nominal defendants instead of the insurance carrier may be akin to a legal fiction" because the insurer is not actually a party to the litigation. *Id.*; *Allen v. Helms*, 293 So. 3d 572, 580 (Fla. Dist. Ct. App. 2020) (citing the trial court's finding that GEICO was subrogated to any right the defendant had to recover attorneys' fees and costs from the plaintiff because GEICO was the real party in interest to the proposals for settlement and that "the plaintiffs stand in the shoes of the defendant as against GEICO, and have no greater interest in the proposals for settlement than did the defendant").

Similarly, under Indiana law, "a party is not required to personally pay the bills for his representation in order to be eligible for an award of attorney's fees." *Rand v. City of Gary*, 834 N.E.2d 721, 722 (Ind. Ct. App. 2005) (citing *Beeson v. Christian*, 594 N.E.2d 441 (Ind. 1992); *Poulard v. Lauth*, 793 N.E.2d 1120 (Ind. Ct. App. 2003); *Harco, Inc. of Indianapolis v. Plainfield Interstate Fam. Dining Assocs.*, 758 N.E.2d 931, 944 (Ind. Ct. App. 2001)). And the entity that paid the attorneys' fees for a party to the litigation is "the real party in interest" to an award of attorneys' fees to that party. *Id.* at 722, 723 (affirming the trial court's "order finding that the City had paid the attorney's fees for Mahmoud and granting Mahmoud's oral request for the City to be named the real party in interest"). In a related context, Indiana courts recognize that an insurer who has paid the entire claim is the real party in interest. *Steury v. N. Ind. Pub. Serv. Co.*, 510 N.E.2d 213, 215 (Ind. Ct. App. 1987) (holding that the insured, where the insured paid a $100 deductible, could sue in its own name to "recover the full amount of the loss, distributing a proportion of the proceeds to the insurer" (citing *Risner v. Gibbons*, 197 N.E.2d 184 (Ind. App. 1964))); *see also Amli Mgmt. Co. v. Nexus Valve, Inc.*, No. 1:20-CV-2034, 2020

24

WL 7239215, at *7 (S.D. Ind. Dec. 9, 2020) (citing *Whiteco Indus., Inc. v. Non-Stop Creativity Corp.*, No. 2:13-CV-64, 2015 WL 8957852, at *2 n.3 (N.D. Ind. Dec. 15, 2015)).

Finally, both Indiana and Florida hold that an insurer has no right to subrogation against an insured's recovery from a third party unless the insured is compensated completely for the covered loss, or in other words, is made whole. *See Puente*, 9 N.E.3d at 218 (citing *Wirth v. Am. Fam. Mut. Ins.*, 950 N.E.2d 1214 (Ind. Ct. App. 2011); *Fla. Farm Bureau Ins. v. Martin*, 377 So. 2d 827, 830 (Fla. Dist. Ct. App. 1979)). And both states find that the equitable made-whole doctrine is only rendered inapplicable by a subrogation clause in an insurance contract "so long as the contract clearly, unequivocally, and with such certainty 'as to admit no doubt on the question' indicates that the made-whole doctrine does not apply." *Puente*, 234 S.W.3d at 218 (quoting *Wirth*, 950 N.E.2d 1214); *see Fla. Farm Bureau Ins.*, 377 So. 2d at 827 (recognizing that "[s]ince subrogation is an offspring of equity, equitable principles apply, even when the subrogation is based on contract, except as modified by specific provisions in the contract," and that "[i]n the absence of express terms to the contrary, the insured is entitled to be made whole before the insurer may recover any portion of the recovery from the tortfeasor").

Turning to Lexington's argument, the insurance policies Lexington issued to FBB contain subrogation provisions giving Lexington a contractual right to recover from third parties the payments it made under the policies and to be subrogated to all FBB's rights against those third parties. Thus, because Lexington funded the $3,911,986.34 in attorneys' fees in FBB's defense in the Arbitration and the arbitration panel awarded the same $3,911,986.34 in attorneys' fees to FBB, Lexington is the real party in interest to the $3,911,986.34 of the award representing the fees it paid. FBB, as the nominal party to recover the fees in the Arbitration, never had any right to the portion of the Attorneys' Fee Award that represents Lexington's funding of FBB's defense

25

under the insurance policies. If, as GAIC argues, GAIC stood in the shoes of FBB, GAIC would be standing in the shoes of FBB against Lexington, in which case Lexington wins as to the $3,911,986.34 of the Attorneys' Fee Award. A contrary finding would leave FBB unjustly enriched in the amount of $3,911,986.349 because FBB did not pay those attorneys' fees in the Arbitration.

In response, GAIC asserts three arguments to show that Lexington does not have equitable subrogation rights in the award. First, GAIC cites two cases for the proposition that, as a general rule, an insurer may not subrogate against its own insured. *See N. Ind. Pub. Serv. Co. v. Bloom*, 847 N.E.2d 175, 186 (Ind. 2006) ("No right of subrogation arises in favor of an insurer against its own insured." (citing 16 Couch on Insurance (Third), § 224:1 (West 1998))); *Zurich Am. Ins. v. Puccini, LLC*, 271 So. 3d 1079, 1081 (Fla. Dist. Ct. App. 2019) ("[An] insurer may bring a subrogation action against the tortfeasor to recover the amounts paid under the insurance policy. However, an insurer may not maintain a subrogation action against its own insured, even if the insured's negligence caused the loss." (cleaned up)). Both cases are distinguishable because Lexington is not seeking recovery from FBB but is seeking to recover the money awarded in arbitration to FBB for the attorneys' fees Lexington paid on behalf of FBB.

Second, GAIC argues that Lexington waived any equitable right of subrogation by contract. In support, GAIC cites the relevant provisions of the Construction Contract and the General Liability Policy, arguing that the "agreed contract terms" control the parties' intent. *See Puente*, 9 N.E.3d at 216–17. The Professional Liability Policy did not contain a waiver provision, and GAIC does not argue waiver as to the attorneys' fees sought under that policy.

As for the General Liability Policy, the waiver of subrogation provision provides that Lexington waives subrogation against "any person or organization where the insured [FBB] has

26

waived liability of such person or organization as part of a written contractual agreement." It is undisputed that FBB did not waive the liability of CAB as demonstrated by FBB's recovery of millions of dollars on its Counterclaims in the Arbitration underlying this lawsuit. GAIC offers no analysis of the General Liability Policy terms to argue the contrary. By its plain terms, that waiver of subrogation provision does not apply here. *See Adkins v. Vigilant Ins.*, 927 N.E.2d 385, 389 (Ind. Ct. App. 2010) ("We review an insurance policy using the same rules of interpretation applied to other contracts, namely if the language is clear and unambiguous we will apply the plain and ordinary meaning." (citation omitted)); *Siegle v. Progressive Consumers Ins.*, 819 So.2d 732, 736 (Fla. 2002) ("[T]erms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced or unrealistic construction." (citation omitted)).

As for the Construction Contract between FBB and CAB, GAIC is correct that it contains a provision requiring that "[a]ll insurance policies . . . contain a waiver of subrogation provision pursuant to which the insurer is prohibited from obtaining subrogation or transfer rights in respect of any claim under such policies against EPC Contractor [FBB], Owner [CAB] or where applicable, Major Subcontractors . . . ." However, the insurance policies did not contain such a provision, and at no time did CAB enforce that provision of the Construction Contract. Under the plain and ordinary meaning of the insurance policies, Lexington did not waive its subrogation rights to the $3,911,986.34 of the Attorneys' Fee Award.

Third, GAIC argues that Lexington does not have equitable subrogation rights because Lexington failed to make FBB whole. The equitable made-whole doctrine provides that "a subrogee is not entitled to subrogation unless and until the subrogor has been compensated

27

completely for the covered loss." *Puente*, 9 N.E.3d at 218. As referenced above, the doctrine can be "rendered inapplicable by virtue of a subrogation clause in an insurance contract, so long as the contract clearly, unequivocally, and with such certainty 'as to admit no doubt on the question' indicates that the made-whole doctrine does not apply." *Id.* (quoting *Wirth*, 950 N.E.2d at 1217). Here, the transfer of rights provisions of the insurance policies do not contain any such clear, unequivocal language that would render the made-whole doctrine inapplicable.

Nevertheless, FBB has been made whole for its claims in the Arbitration through the arbitration panels' Arbitration Award to FBB of $4,939,423.98 in Contract Damages and the $820,494.00 of the Attorneys' Fee Award representing the attorneys' fees and costs FBB paid in the Arbitration. *See Wirth*, 950 N.E.2d at 1217 (finding that the insurer was entitled to proceed on its subrogation claim where the insured collected a full and final settlement of his claims against the tortfeasor, even though the insured claimed that the full value of its claim was higher than the settlement); *Tampa Port Auth. v. M/V Duchess*, 65 F. Supp. 2d 1299, 1302 (M.D. Fla. 1997) (holding that an insured is made whole by a damages judgment entered in a prior bench trial). Because FBB did not pay the remaining $3,911,986.34 of the Attorneys' Fee Award—it was paid by Lexington, that sum is not included in FBB's recovery to be made whole.

The Court recognizes that FBB's full award remains offset by the $1,560,300.00 Liquidated Damages award to CAB. However, resolution of the Liquidated Damages dispute is unnecessary to order GAIC to distribute the $3,911,986.34 of the Attorneys' Fee Award to Lexington. As discussed above in Part A, if it is determined in the Florida arbitration that Lexington is not required to indemnify FBB for the Liquidated Damages, then the Liquidated Damages are FBB's responsibility, and FBB will have been made whole in the Arbitration notwithstanding the offset for the Liquidated Damages. If it is found that Lexington is required to

28

indemnify FBB for the Liquidated Damages, once indemnified, FBB will have received the full amount of the Contract Damages and the remaining $820,494.00 of the Attorneys' Fee Award, which will no longer be subject to any offset. Finally, GAIC has offered no law in support of its suggestion that FBB has not made whole in the Arbitration because of additional uncompensated costs in the state court actions.

Thus, Lexington is the real party in interest to the $3,911,986.34 of the Attorneys' Fee Award representing the funds paid by Lexington, and any rights GAIC has to FBB's rights in the Arbitration Award, whether through a perfected security interest or equitable subrogation, do not extend to Lexington's $3,911,986.34.

**C.** **GAIC's Bases for Asserting an Interest in the $3,911,986.34 of the Attorneys' Fee Award**

GAIC argues that any right Lexington has to the $3,911,986.34 of the Attorneys' Fee Award is secondary to GAIC's perfected security interest under the UCC and GAIC's equitable subrogation rights. Both arguments fail.

*1.    A Security Interest in the Net Award*

GAIC first claims its entitlement to the entire Net Award as collateral in which it has a priority interest perfected by the UCC filing. A security interest attaches and is enforceable when (1) the debtor has signed a security agreement that contains a description of the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. *See* Ind. Code § 26-1-9.1-203(b); *Fifth Third Bank v. Comark, Inc.*, 794 N.E.2d 433, 439 (Ind. Ct. App. 2003) (citing Ind. Code § 26-1-9-203).[9]

---

[9] Because Indiana law does not recognize dépeçage, the Court applies Indiana state law to each issue within this count. *Ky. Nat'l Ins.*, 919 N.E.2d at 575–76 ("[T]he Indiana Supreme Court has held that Indiana does not engage in *dépeçage*, which is 'the process of analyzing different issues within the same case separately under the laws of different states. Although Indiana allows different claims to be analyzed separately, it does not allow issues within those counts to be analyzed separately.'" (quoting *Simon*, 805

GAIC argues that the security agreement requirement is satisfied by the AOI between GAIC and FBB and the Financing Agreement that describes the collateral as including "[a]ll the rights of [FBB] in . . . any contracts," which would be the Construction Contract, as well as "[a]ll actions, causes of action, claims and/or or the proceeds therefrom," which would be the Arbitration. The Court need not address whether the AOI applies to the Arbitration (which the parties vigorously dispute), because, as argued by Lexington and held above, FBB, as debtor, had no rights in the $3,911,986.34 of the Attorneys' Fee Award that represents Lexington's funding of FBB's defense in the Arbitration.[10] Therefore, any security interest of GAIC's did not attach to the disputed $3,911,986.34 of the Attorneys' Fee Award. GAIC cites no law addressing a surety having a perfected security interest in attorneys' fees awarded in arbitration that were paid by its principal's insurer. Whether GAIC has a perfected security interest in the Contract Damages and the remaining portion of the Attorneys' Fee Award is a matter between GAIC and FBB and not a question before the Court.

2.    *Equitable Subrogation as Surety*

GAIC also argues that it has an equitable subrogation right to the Net Award as a surety that satisfied its principal's (FBB's) obligation. Indeed, "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins.*, 371 U.S. 132,

---

N.E.2d at 801)). Nevertheless, "[b]oth Florida and Indiana have adopted the Uniform Commercial Code so there is no difference in the state[s'] laws that would require a choice of law analysis." *Poultry & Indus. Suppliers, Inc. v. Incubacol, S.A.S.*, 250 N.E.3d 448, 457–58 (Ind. Ct. App. 2024), *transfer denied*, 257 N.E.3d 779 (Ind. 2025).

[10] Thus, the Court does not decide whether the Indiana Court of Appeals' decision in *Great American Insurance Company v. Cline Avenue Bridge, LLC*, 235 N.E.3d 1269 (Ind. App. 2024), *reh'g denied* (July 26, 2024), *transfer denied sub nom. Great American Insurance Company v. Cline Precast, LLC*, 248 N.E.3d 1204 (Ind. 2024), has issue preclusion effect in this case as to the applicability of the AOI.

136–37 (1962). However, GAIC cites no law establishing an equitable right of subrogation in attorneys' fees awarded in arbitration for fees that its subrogee's insurer paid.

All the authorities cited by GAIC involve a performing or paying surety's right to "remaining contract funds" or "retained contract funds." *See Henningsen v. U.S. Fid. & Guar. Co.*, 208 U.S. 404 (1908) (holding that a payment bond surety that made payments to suppliers and subcontractors was equitably subrogated to the rights of the defaulted principal to the "balance due on the contract"); *Nat'l Fire Ins. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1271–72 (11th Cir. 2003) (clarifying that a "payment bond surety, who stands in the shoes of laborers and materialmen, normally has priority with respect to *remaining contract balances* because those laborers and materialmen would have high priority liens against the property under state law" and a "performance bond surety who actually performs stands in the principal's shoes and can demand payment of the *remaining contract balances*" (emphasis added)); *Pearlman*, 371 U.S. at 133, 136–37 (finding that the payment bond surety had the superior right and title "to *a fund withheld* by the Government out of earnings due the contractor" and holding that "the surety, having paid the laborers and materialmen, is entitled to the benefit of all [the] rights [to the Government's "retained fund"] to the extent necessary to reimburse it"); *Balboa Ins. v. United States*, 775 F.2d 1158, 1161 (Fed. Cir. 1985) ("When the surety then finances the contract to completion, it is subrogated to the contractor's property rights in the *contract balance*." (citing *Pearlman*, 371 U.S. 132)); *Prairie State Nat'l Bank v. United States*, 164 U.S. 227, 230, 232, 240 (1896) (holding that the surety had the priority entitlement to subrogation in "the fund" or the "10 per cent. retained by the government"); *Colonial Sur. Co. v. United States*, 108 Fed. Cl. 622, 633 (2013) ("The theory of equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law

31

whereby the surety 'is subrogated to the [principal contractor's] property rights in the contract balance." (cleaned up)); Restatement (Third) of Suretyship & Guaranty § 28 (1996), Illus. 6 (explaining that, under the illustration, the surety "may recover from [the owner] the remaining $300,000 owed under the construction contract because, as 'return performance,' the remaining $300,000 owed under the contract is security for [the builder's] underlying obligation").

GAIC has not shown that the $3,911,986.34 sought by Lexington of the $4,732,480.34 Attorneys' Fee Award in the arbitration constitutes "remaining contract funds."[11] GAIC reasons only that, because the Attorneys' Fee Award was predicated on the arbitration panel's rejection of CAB's argument that FBB was insolvent and because GAIC as surety had provided the funding to keep FBB afloat, GAIC's financing of FBB created the basis for the Attorneys' Fee Award. As discussed in Part A above, the Attorneys' Fee Award was predicated on the fees and costs paid by Lexington and FBB; the Attorneys' Fee Award is not funds retained by CAB for the completion of the Project. Moreover, as argued by Lexington, because FBB did not have a right in the $3,911,986.34 in Attorneys' Fees, neither did GAIC as surety. *See Erie Ins.*, 681 N.E.2d at 186 ("It is settled that subrogation confers no greater right than the subrogor had at the time the surety or indemnitor became subrogated. The subrogator[sic] stands in the same position as the subrogor, for one cannot acquire by subrogation what another, whose rights he claims, did not have." (cleaned up)).

Finally, GAIC asserts that by virtue of its equitable right of subrogation as surety, it not only steps into the shoes of the principal, FBB, but also steps into the shoes of the owner, CAB,

---

[11] The parties do not appear to dispute that the $4,939,423.98 of Contract Damages paid by CAB to FBB are just such "remaining contract funds" for items such as unpaid work through March 2020, unpaid retainage, unpaid work for the first week of April 2020, crane mats credit, falsework credit, and post-termination expenses awarded by the arbitration panel. However, the Court does not reach the question because Lexington is not seeking the Contract Damages and this is an issue between GAIC and FBB.

and "has a right of set off as to any funds that may be owed." GAIC Summ. J. Br. 12, ECF No. 60 (citing *Transamerica Ins. v. United States*, 989 F.2d 1188, 1194–95 (Fed. Cir. 1993); *United States v. Munsey Tr. Co. of Washington, D.C.*, 332 U.S. 234, 243–44 (1947)); GAIC Reply Br. 9, ECF No. 71 (citing *Transamerica Ins. v. Barnett Bank of Marion Cnty., N.A.*, 540 So. 2d 113, 116 (Fla. 1989); *Travelers Cas. & Sur. Co. of Am. v. Paderta*, No. 10 C 406, 2013 WL 3388739, at *4 (N.D. Ill. July 8, 2013)). GAIC reasons that the remaining Liquidated Damages award to CAB can now be applied by GAIC to offset Lexington's claim to the $3,911,986.34 of the Attorneys' Fee Award owed to FBB by CAB. First, all these cases again address the right to retained contract funds. Moreover, as argued by Lexington, CAB's liability to FBB was already reduced by the amount of the Liquidated Damages Award (and the Delay Damages Award), resulting in the Net Award. Any recovery by FBB of the Liquidated Damages will be paid by Lexington. And, as explained above, FBB and Lexington's dispute over Lexington's coverage of the Liquidated Damages is at issue in the pending Florida arbitration; if it is determined that Lexington must indemnify FBB for the Liquidated Damages, it is likely GAIC will ultimately benefit from the award based on FBB's indemnity obligation.[12]

Thus, GAIC has not established that it has equitable subrogation rights in the $3,911,986.34 of the Attorneys' Fee Award paid by Lexington in FBB's defense.

**D.    Constructive Trust**

In its Counterclaim, Lexington seeks either an equitable lien or a constructive trust against the $3,911,986.34 of the Net Award currently held by GAIC pending resolution of this litigation. A constructive trust "may be imposed where a person holding title to property is

---

[12] GAIC's argument that Lexington should not be awarded the $3,911,986.34 of the Attorneys' Fee Award because it will increase FBB indemnity obligation to GAIC is not well taken. The transfer of the $3,911,986.34 to Lexington, which was never FBB's, will simply not reduce FBB's obligation to GAIC.

33

subject to an equitable duty to convey it to another on the ground that he or she would be unjustly enriched if permitted to retain it." *Deal v. Gittings*, 144 N.E.3d 716, 726 (Ind. Ct. App. 2020) (quoting *Demming v. Underwood*, 943 N.E.2d 878, 895 (Ind. Ct. App. 2011), *trans. denied*)). The Indiana Supreme Court explained:

> A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, *or through the wrongful disposition of another's property*. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.

*Melloh v. Gladis*, 309 N.E.2d 433, 438–39 (Ind. 1974) (emphasis added).

Because Lexington is the real party in interest to the $3,911,986.34 of the Attorneys' Fee Award and that money is currently held by GAIC pending the resolution of this litigation, GAIC would be unjustly enriched if it retained possession of the $3,911,986.34. Therefore, a constructive trust is imposed such that GAIC is holding the $3,911,986.34 subject to an equitable duty to convey it to Lexington.

Lexington also requests an award of prejudgment interest but does not offer any law in support. In diversity actions like this, the Court looks to state law to determine whether to award prejudgment interest and how to compute the interest. *Travelers Ins. v. Transp. Ins.*, 846 F.2d 1048, 1051 (7th Cir. 1988). Therefore, the Court will order additional briefing on whether prejudgment interest should be awarded to Lexington.

Thus, the Court grants Lexington's motion for summary judgment on Count II of its Counterclaim for a constructive trust and denies GAIC's motion for summary judgment on the claim. As a result, the Court grants Lexington's motion for summary judgment on GAIC's claim in Count I of the Amended Complaint for a declaratory judgment that Lexington has no interest

34

in the $3,911,986.34 of the Attorneys' Fee Award and denies GAIC's motion for summary judgment on its claim. The Court will enter judgment requiring GAIC to transfer $3,911,986.34 of the Net Award it is holding to Lexington.

**E.     Tortious Interference with Contract Claims**

Both parties bring a claim for tortious interference with contract. To prevail on a claim of tortious interference with contract, a plaintiff must show the "(1) existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)). As cited by the Indiana Supreme Court, the Restatement (Second) of Torts suggests that the following seven factors be considered in determining whether a defendant's conduct in intentionally interfering with a contract was unjustified:

> (a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties.

*Winkler*, 638 N.E.2d at 1235 (quoting Restatement (Second) of Torts § 767 (1977)); *see Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind. Ct. App. 2000). "[T]he weight to be given to each consideration may differ from case to case depending upon the factual circumstances . . . ." *Winkler*, 638 N.E.2d at 1235 (citing Restatement (Second) of Torts § 767, cmt. j). Nevertheless, "the overriding question is whether the defendant['s] conduct has been fair and reasonable under the circumstances." *Id.* (same); *see Levee*, 729 N.E.2d at 221.

*1.    GAIC's Claim*

GAIC asserts that GAIC and FBB entered into the AOI and the UCC Financing Statement and that Lexington was made aware of both in August 2022. GAIC argues that Lexington interfered with those contracts by contacting CAB and demanding that a portion of the Net Award be paid to Lexington, causing FBB to breach its duty to comply with its obligations under the AOI. GAIC contends that Lexington's actions prevented payment of the Net Award, causing CAB to interplead the funds and delaying payment to GAIC. As for the absence of justification, GAIC argues that Lexington had, at best, an interest in only a portion of the Net Award that was also junior to GAIC's interest. GAIC's alleged damages are the denial of the use of the funds until Lexington withdrew its objection in the state court action to disbursement of the funds on June 26, 2023. Lexington responds that it had ample justification to seek its portion of the Attorneys' Fee Award pursuant to the insurance contracts and under the law.

The Court finds that GAIC cannot show that Lexington's conduct in seeking $3,911,986.34 of the Attorneys' Fee Award representing the fees it paid on behalf of FBB in the Arbitration was unjustified because of Lexington's contractual and legal right to the award. Therefore, the Court grants Lexington's motion for summary judgment on GAIC's claim for tortious interference with a contractual relationship brought in Count 1 of the Amended Complaint and denies GAIC's motion for summary judgment on its claim.

*2.    Lexington's Claim*

Turning to Lexington's reciprocal counterclaim for tortious interference with contract in Count I of the Counterclaim, Lexington contends that GAIC tortiously interfered with Lexington's claim to the $3,911,986.34 of the Attorneys' Fee Award representing the defense fees and costs Lexington paid on behalf of FBB under the insurance contracts. Lexington asserts

36

that Lexington and FBB entered into insurance policies with valid and enforceable subrogation clauses in favor of Lexington and that GAIC was aware of the policies. Lexington argues that GAIC intentionally acted to induce FBB to breach the transfer of rights provisions of the insurance policies by asserting an interest in the full Net Award. As for an absence of justification, Lexington asserts generally that GAIC was not justified in asserting a claim to Lexington's portion of the Attorneys' Fee Award for the reasons set forth in other parts of its brief. Lexington argues that it was damaged by being deprived of interest on the fee award that should have been paid to Lexington and incurring fees to pursue the award.

GAIC responds that Lexington cannot claim interference with the insurance contracts because Lexington waived its right of subrogation. As held above, Lexington did not waive its right to subrogation. However, GAIC also argues that, in exercising its superior rights, it could not have interfered with any contractual rights Lexington may have. While the Court has found that Lexington was the real party in interest to the $3,911,986.34 of the Attorneys' Fee Award such that GAIC must turn over those funds to Lexington, Lexington has not shown that GAIC was not justified in attempting to enforce its rights of indemnification and subrogation in the Net Award given the complexity of the legal issues in this case. Therefore, the Court grants GAIC's motion for summary judgment on Lexington's claim for tortious interference with contract in Count I of the Counterclaim and denies Lexington's motion for summary judgment on its claim.

## F.    GAIC's Count 4—Stipulation of Dismissal

The parties filed a Stipulation of Dismissal of Great American Insurance Company's Count 4 [ECF No. 56], stipulating to the dismissal with prejudice of GAIC's Amended Complaint Count 4 pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Because the Seventh Circuit Court of Appeals has explained that Rule 41(a)(1) is not the proper vehicle for

37

dismissing individual claims or parties, the Court construes the stipulation as a joint motion to dismiss and grants the motion. *See Taylor v. Brown*, 787 F.3d 851, 857–58, 858 n.9 (7th Cir. 2015).

## CONCLUSION

For the reasons set forth above, the Court hereby

1.      GRANTS the motion contained within the Stipulation of Dismissal of Great American Insurance Company's Count 4 [ECF No. 56] and DISMISSES with prejudice Count 4 of GAIC's Amended Complaint;

2.      GRANTS in part and DENIES in part Lexington's Motion for Summary Judgment [ECF No. 57], denying the motion on Lexington's claim for tortious interference with contract in Count I of its Counterclaim, granting the motion on Lexington's claim for constructive trust in Count II of its Counterclaim against GAIC for $3,911,986.34, granting the motion on GAIC's claim for tortious interference with a contractual relationship in Count I of the Amended Complaint, granting the motion on GAIC's claim for declaratory judgment in Count 2 of the Amended Complaint, and denying without prejudice Lexington's request for prejudgment interest subject to further briefing;

3.      GRANTS in part and DENIES in part Great American Insurance Company's Motion for Summary Judgment [ECF No. 59], denying the motion on GAIC's claim for tortious interference with a contractual relationship in Count I of the Amended Complaint, denying the motion on GAIC's claim for declaratory judgment in Count 2 of the Amended Complaint, granting the motion on Lexington's claim for tortious interference with contract in Count I of the Counterclaim, and denying the motion on Lexington's claim for constructive trust in Count II of the Counterclaim;

4.    IMPOSES a constructive trust in favor of Lexington upon the $3,911,986.34 held by GAIC, representing the arbitration panel's award of attorneys' fees and costs paid by Lexington for which Lexington is the real party in interest;

5.    WITHHOLDS entry of judgment until the Court determines whether to award prejudgment interest, and if so, how much, on the award of $3,911,986.34 to Lexington and against GAIC; and

6.    ORDERS Counterclaimant Lexington to file a motion for prejudgment interest on or before April 22, 2026, setting forth the basis for and calculation of the prejudgment interest; Counterclaim Defendant GAIC to file a response, if any, on or before May 6, 2026, and Counterclaimant Lexington to file a reply, if any, on or before May 13, 2026.

SO ORDERED on March 24, 2026.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT